## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ROSANN SCHULTZ BERKEMEIER,

     Plaintiff,

     v.                            Case No. 14-2363-JAR

STANDARD BEVERAGE CORPORATION,


     Defendant.

## MEMORANDUM AND ORDER

Plaintiff Rosann Schultz Berkemeier brings this action against her former employer, Defendant Standard Beverage Corporation ("SBC"), alleging discrimination and retaliation under Title VII of the Civil Rights Act of 1964, and retaliatory discharge in violation of public policy under Kansas law.  Before the Court is Defendant's Motion for Summary Judgment (Doc. 44).  The motion is fully briefed and the Court is prepared to rule.  For the reasons explained in detail below, the Court grants in part and denies in part Defendant's motion for summary judgment.

## I.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.    Uncontroverted Facts

The following material facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

Plaintiff has a Bachelor of Science degree from Missouri State University and an MBA from the University of Notre Dame.  Prior to her work at SBC, Plaintiff worked at YRC Freight for eleven years (most recently as Director of Finance), and at Hostess Brands for approximately one year (also as Director of Finance).  Shortly before October 2010, a recruiter contacted Plaintiff about the open position of Vice President of Financial Planning and Analysis at SBC.  Plaintiff interviewed for the position with several people, including Darrell Swank (President of

---

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

then SBC-affiliated company, LRICO Services, LLC), Ross Schimmels (President of SBC), and

Nate Rosier (Chief Operating Officer for SBC).  Plaintiff was hired by SBC on October 29,

2010, in the position of Vice President of Financial Planning and Analysis in its Lenexa facility,

with a starting salary of $125,000 per year, as well as eligibility for an annual performance bonus

up to 25% of her base salary.  Plaintiff was responsible for daily, weekly, and monthly financial

reporting; metric analysis; monthly and quarterly business reviews; oversight of supplier funds;

expense reporting; financial modeling; and pricing analysis.  During the term of her employment,

Plaintiff was the only female Vice President employed by SBC.

       For the first nine months of Plaintiff's employment, all of the Lenexa offices were

occupied, so she worked from an assigned cubicle.  Plaintiff was given an office in June 2011,

after the President's secretary was moved out of an office, and after the Lenexa facility was

remodeled.  Her office was near Bruce Alexander's office, who became President of SBC in

June 2011.

       ***Company Vehicle Policy***

       Defendant's 2005 Employee Handbook included a vehicle use policy, stating that "Vice

Presidents, Regional Managers and Sr. Management will be allowed to drive a SBC owned

vehicle as a fringe benefit."[16]  Plaintiff learned soon after being hired that she was the only Vice

President in the company who was not assigned a company vehicle.  She began asking her

superiors about the vehicle policy and why she was not assigned a company vehicle.  Rosier told

Plaintiff that he did not have a company vehicle either, and that he believed SBC was preparing

to eliminate the vehicle program.  Plaintiff claims she spoke to Alexander about the issue several

times between June 2011 and March 2012.  She recalls telling Alexander that she believed she

---

[16]Doc. 58-3, Ex. 2 at 13.

was being treated unfairly because she was the only female Vice President.  Alexander told Plaintiff that the vehicle policy was intended only for those in sales positions and denied her allegation of unfair treatment.  Alexander later told Plaintiff that the policy was intended only for those employees whose roles required travel.  But Plaintiff was aware of other non-sales Vice Presidents who had been provided company cars.  Plaintiff raised the issue again with Alexander in February 2012, after SBC hired Darryl Lyon as Vice President of Operations and provided him with a company vehicle.  Alexander told Plaintiff that Lyon was provided a car because he may be traveling to Wichita and Kansas City on occasion.

Alexander acknowledges that Plaintiff had a conversation with him about company vehicles, but denies that she brought up the company policy on the matter or that he had ever seen the policy prior to March of 2012, when Plaintiff took her complaint to Swank and to the head of Human Resources ("HR") at LRICO, Russell Diez-Canseco.  Plaintiff pointed Diez-Conseco to the language in the 2005 Handbook, and asked why she was the only Vice President at SBC who did not have a company vehicle.  Diez-Canseco asked Plaintiff whether she had discussed a car with her supervisors, and she responded that she had talked about the issue with Rosier.  Within days of e-mailing Diez-Canseco, Plaintiff received a call from him advising her that "the decision was made that [she] could have a company car."  Alexander did not make the decision to provide Plaintiff with a car, and Swank does not recall discussing the decision with Diez-Conseco.  Diez-Conseco does not recall exactly who made the decision to provide Plaintiff with a company car and does not recall her claiming that the policy was applied differently to her because she is female.  Plaintiff had the use of a company car for the remainder of her tenure at SBC.

Just after SBC provided Plaintiff with a company car, the SBC handbook was modified to remove the company vehicle policy.  It is unclear exactly who at SBC decided to eliminate the company vehicle policy.

### Performance

During her employment with SBC, Plaintiff received only one written performance review, which was prepared by Alexander in August 2011, based on her performance between June 1, 2011 and August 15, 2011.  Alexander gave Plaintiff an overall rating of "Exceeds standards," the highest possible overall rating.  The evaluation included ratings for several job responsibilities.  Alexander assigned a rating on a scale of 1–5 for each of twelve job responsibilities and provided supporting comments next to each.  Plaintiff was rated a 3 (consistently meets requirements) or 4 (exceeds requirements) on all but one job responsibility.  On personal appearance, Plaintiff received a 2 (occasionally meets requirements).  Alexander explained: "As we strive towards a more professional work environment, I ask all our VPs to work on a more professional look while in the office and especially when meeting with suppliers and customers."[17]  But the majority of Alexander's comments were positive, including: "Rosie adds tremendous value to SBC"; "She sets high standards for herself and her staff and delivers against a very aggressive project load"; "Rosie can be counted on to deliver each day"; "Rosie is aggressive about getting things done.  She knows what resources are needed and only involves those who are needed.  She can be counted [sic] get things done well beyond a normal work day."[18]

Bonuses for vice presidents were based on a predetermined model where, if an employee hit certain metrics within the employee's job responsibility, the employee was paid a bonus of a

---

[17]Doc. 58-10, Ex. 9.

[18]*Id.*

specific percentage.  On October 10, 2011, at the end of SBC's September 30 fiscal year,

Plaintiff received a 6% raise, increasing her annual salary to $132,500.  In December 2011, she

received a $28,646 bonus, which was 22.9% of her annual salary.  Plaintiff's bonus was the

largest bonus paid to the seven SBC vice presidents, both by gross bonus amount and by

percentage.

In the middle of 2012, Alexander increased bonus eligibility for the vice presidents of

sales, all of whom were male, from 25% to 30%.  There were other vice presidents at SBC who

were not in sales, like Plaintiff, and those vice presidents did not receive the increase in bonus

eligibility.  Plaintiff spoke with Alexander about this change, and asked why her bonus eligibility

was not increased.  Alexander explained that bonus eligibility was increased for the sales vice

presidents because of their level of responsibility, and that her compensation would be evaluated

again in the future.  Plaintiff also complained to Jim Knight in August 2012 that she did not

believe the bonus change was fair.

On October 7, 2012, Plaintiff received a 3% salary increase to $136,475.  On December

14, 2012, Plaintiff was paid a 25.42% bonus of $33,683.  Of the nine Vice Presidents at SBC in

2012, Plaintiff's was the third highest paid bonus based on gross bonus amount, and the fourth

highest based on percentage of annual salary.

### Liquor Control Law Reports

On multiple occasions in late 2011 and early 2012, Plaintiff told Alexander and other

managers of SBC in both emails and verbally that she had discovered that SBC was violating

Kansas liquor control laws.  Plaintiff specifically reported three instances of liquor control law

violations.

First, in approximately December 2011, Plaintiff reported that John D'Attoma, then Vice President-Spirits was illegally changing prices after the month began for select large liquor store customers. Plaintiff noticed during her normal compliance duties that SBC was changing the price of certain products mid-month. She knew that this was prohibited by Kansas law. Plaintiff brought the matter to Alexander's attention and Alexander asked Plaintiff to provide him with an analysis of the issue; Plaintiff had access to a database that showed the price of a product by day. As part of Plaintiff's investigation in the matter, she determined that D'Attoma's administrative assistant had made the price changes at the direction of D'Attoma. After Plaintiff provided these findings to Alexander, she was told that pricing responsibilities would be removed from administrative assistants and would instead fall within Plaintiff's oversight. Ultimately, SBC hired a pricing coordinator to handle price changes.

Second, Plaintiff reported that D'Attoma was illegally offering "Value Added Products" ("VAPs") to select customers. In May 2012, SBC received a subpoena from the Alcoholic Beverage Commission ("ABC") inquiring into SBC's practice of distributing VAPs to Kansas retailers. Alexander asked Plaintiff to gather information regarding the request and provide her interpretation of that data regarding whether SBC was showing favoritism to larger retailers in the VAP distribution. Plaintiff provided this information to Alexander and Tuck Duncan, who was outside legal counsel. Also, Rudd asked that Plaintiff "outline what happened with John D'Attoma as I've never fully understood what happened," in an email to Alexander about a May 8, 2012 meeting agenda.

Finally, Plaintiff learned that Scott Davies, General Manager of SBC's Wichita area, was illegally taking Ron Groves, owner of one of the largest liquor stores in Kansas, to lunch. As part of her job duties, Plaintiff reviewed expense reports to determine whether they were

compliant with IRS requirements.  In the early summer of 2012, Plaintiff noticed an expense report from Davies where he identified one of the largest retailers in the state as taking him out to lunch on more than one occasion.  Plaintiff understood that this violated Kansas liquor control laws, so she notified Alexander, who assured her that he would not include Groves' name on an expense report going forward.

### SBC Reorganization

In December 2011, Swank sent an email to Plaintiff, asking her to meet with him in Lawrence, Kansas.  On December 30, 2011, Plaintiff emailed Swank and Alexander under the subject line "Opportunity."  She thanked them and told them she had "decided to accept the opportunity of leading the Accounting and Finance teams for Standard Beverage in the Lenexa office."[19]  On January 2, 2012, Swank responded, thanking Plaintiff for her note and stating that he would call her the next day to "catch up on the below, as well as another item or two.  Bruce and I will be pulling together our thoughts/next steps this week, with the timing of any communication/action steps to play out the following week."[20]  Plaintiff and Swank had additional phone conversations following the email exchange, during which Swank told Plaintiff he did not want to fill the position immediately, and that there would be a pause before they would combine the two departments for Plaintiff to lead as the official CFO.

On April 9, 2012, Swank sent an email to Alexander attaching a summary of topics for the two of them to discuss the following day.  Included in the list of topics in the attached summary were: "Purchasing/Inventory—out of stocks, day-to-day focus/leadership of this," and "Lead Financial Person/CFO—Wichita versus Lenexa/Rosie B not it."[21]  At that time, Swank

---

[19]Doc. 58-11, Ex. 10.

[20]*Id.*

[21]Doc. 58-30 , Ex. 29 at 2.

and Alexander had concluded that Plaintiff was not going to be the lead financial person or CFO at SBC.  In May 2012, Alexander announced that Rich Rusnack was hired as the CFO of SBC.  The decision to hire Rusnack was made by both Alexander and Swank.

On May 18, 2012, Alexander issued a memo with the subject line, "Organizational Changes and Focus."  He announced various changes in responsibility, including transferring sales administrative responsibilities to Rusnack, Plaintiff, and the finance team.  The memo states "Rich will have responsibility working with Rosie to implement changes and ensure that together we drive accountability in all these areas throughout the SBC organization."[22]

In August 2012, on behalf of Swank, HR sent an email to Rusnack, Alexander, Plaintiff, and other recipients, announcing the hire of Jim Knight as the new CFO for LRICO, effective August 20, 2012.  Thereafter, Knight became Plaintiff's supervisor until May 2013.  Rusnack was moved to the position of Chief Operating Officer ("COO") at that time.  Alexander and Rusnack decided that a change needed to be made within the SBC structure because inventory was growing and the company needed a better system to manage it.  Rusnack sought to reorganize the purchasing department to improve communication between the purchasing and sales departments, and to select and implement new inventory forecasting.

On October 3, 2012, Rusnack and Knight issued a memorandum to all SBC employees announcing their decision to move Plaintiff from her position as Vice President of Financial Analysis and Planning to a new position titled Vice President-Supply Chain, starting October 15, 2012.  The memo stated that Plaintiff would have leadership and organizational responsibility for the Purchasing Department based in the Lawrence facility, and would office there starting October 15.  The memo also stated that Plaintiff would be responsible for evaluating and

---

[22]Doc. 58-5, Ex. 4 at 2.

upgrading purchasing processes and system tools, including implementing new forecasting software to achieve industry best practices.

Alexander initially approached Plaintiff about the opportunity, telling her that Swank was unhappy with the performance of the purchasing department, and that he wanted Plaintiff to assess the department and possibly look to implement new software for purchasing.  Both Rusnack and Swank believed this was an important role for the company and would be an opportunity for Plaintiff.  Plaintiff considered the purchasing position she was transferred to in Lawrence in October 2012 to be a demotion, as it did not have the same high level finance responsibilities that she previously was responsible for, and it required her to commute an additional sixty-five to seventy miles per day compared to her prior Vice President of Finance position.  The change in role did not affect her salary and benefits and she retained the title of Vice President.

In approximately May 2013, Rusnack again supervised Plaintiff when he assumed the joint roles of CFO and COO for SBC.  In mid-2013, Rusnack adjusted the bonus structure for the Vice President of Operations only, from an annual bonus payout to quarterly bonus payouts. Plaintiff asked Rusnack if her bonus structure could be changed to a quarterly payout, and Rusnack responded that he would look into it.  Plaintiff never told Rusnack that she thought the decision to adjust the bonus payment structure for the Vice President of Operations, but not for her, was because of her gender.  Plaintiff never complained to HR about bonus eligibility.

Plaintiff and her team selected and implemented new purchasing software called RockySoft that suggests when to purchase products based on how frequently they were sold in the past, and based on internal data about inventory.  Although the software was implemented on time and under budget, there were problems with the software and inventory.  Rusnack testified

that he had discussions with Plaintiff about inventory levels, fill rates, staffing, and management of her team in general.  In one email to Plaintiff written on June 18, 2013, Rusnack responded to Plaintiff's report to him about June inventory levels:

> I want to be sure you understand how critical inventory estimates are.  Per our discussion/emails yesterday, I reported that inventory at the end of June would be $28.8m.  I used that figure in my cash flow model to confirm June distributions to ownership and make statements regarding timing and depth of use of the Commerce Bank credit line.  We will still be able to meet our obligations, however, the $2.4m swing in the calculation means I will have to re-state all of my assumptions to ownership.  Based on preliminary calculations (which we will work on together tomorrow), it appears we have a major disconnect between Rockysoft estimated receipts and actual receipts.[23]

Rusnack instructed Plaintiff not to reply to the e-mail because they would be meeting to discuss the following day.  Rusnack forwarded the June 18 email to Charlene Haynes in HR and asked her to "put this in Rosie's file."[24]

Plaintiff did not understand the problem Rusnack cited in his June 18, 2013 email; she could not follow his rationale because she did not see information in the email chain about "actual receipts."  She also does not recall a follow-up conversation.  Plaintiff understood that forecasting was the responsibility of Rusnack, herself, and others on the team.  Plaintiff further maintains that she did not project inventory levels herself, but was responsible for providing anticipated inventory receipts on a daily basis, which she pulled from the company's database.

Rusnack sent Plaintiff and Michael Wilson an email on July 11, 2013, asking them to work together on an internal audit because "[i]nventory remains high and is having a MAJOR impact on our cash position."[25]  He set forth a list of recommended actions.  Rusnack forwarded this email to HR and instructed them to add it to Plaintiff's file.  Rusnack recalls sending this

---

[23]Doc. 46-21, Ex. 21.

[24]*Id.*

[25]Doc. 46-22.

email in order to convey to the recipients that "this is a full stop situation." He testified in this case that he sent the email to HR because he was growing concerned about Plaintiff's "ability to manage this department."[26] That same day, Rusnack contacted Todd Warnygora of RockySoft Corporation, seeking evaluation and recommendations on the issues SBC was having with the software. Rusnack told Warnygora that he had a meeting that evening with ownership to report on the company's cash position, so he hoped for some information that day to use during the meeting. Rusnack forwarded his email to Haynes in HR and instructed her to include it in Plaintiff's file.

On August 23, 2013, Plaintiff e-mailed Rusnack with a breakdown of a $2.4 million discrepancy for receipt projections for the weeks of September 2, 2013, and September 9, 2013. Plaintiff also provided in this email a list of changes she intended to make to the RockySoft assumptions to trigger more accurate projections. Rusnack again forwarded this email to HR, stating: "Charlene—please put this in Rosie's file. Documentation of a $2.4m error in her forecasting process. She is telling me I have two weeks to cover an incremental $2.4m in purchases that she is just now telling me to include in cash flow plans."[27] Rusnack advised Plaintiff that SBC had to tap into a line of credit because inventory levels were rising greater than what was initially forecasted, and inventory forecasts were reliant upon Plaintiff providing accurate anticipated inventory receipt projections. Plaintiff now contends that the mistake was attributable to a calculation error by Michael Wilson, who had been a member of Plaintiff's team.

On September 6, 2013, Greg DeBow, the Executive Vice President of Sales and Marketing for SBC, emailed Plaintiff asking for her thoughts about why SBC ran out of Barton

---

[26]Doc. 46-12, Ex. 12 at 146:10–147:3.

[27]Doc. 46-24, Ex. 24.

Vodka the day before. He stated: "This is one of our largest vodkas and there have been no changes in posting patterns so what is the driver here? We cannot afford for this to happen on key items. Thoughts please."[28] Plaintiff replied, explaining that in order to reduce inventory levels, she was asked to "reduce the buying quantities from 21 days past lead time (product arriving) to 7 days past lead time. We knew this decision would increase the potential of out of stocks if sales exceeded forecast. This is what happened with Barton's."[29]

### Termination

In a detailed email exchange from August 14 to 29, 2013, Rusnack and Swank discussed plans to restructure the Finance, Accounting, and Supply Chain Departments. They agreed that Angela Wilhelm should be promoted as Vice President of Accounting and Finance "or something like that." Swank recommended she be put on the "SBC bonus program, auto program as VP, etc."[30] Swank recommended that Michael Wilson be put in charge of Purchasing and Finance, and to "[e]xit Rosie 10/1/2013; exit Eric [Williams] 1/1/2014." Rusnack proposed talking to Plaintiff on or before September 1 and proposing an exit date of October 1, with a "transition bonus" of $5000 upon knowledge transfer to Wilson. Swank proposed Wilson be made a Director, "or something like that. I hesitate to name him a VP at this point, but certainly would recommend we increase his base compensation and potentially small increase in target bonus % also."[31]

In June 2013, Rusnack began to discuss the option of Plaintiff's termination with Theresa Bengston, who was Director of HR at that time. Rusnack told Bengsten about the $2.4 million

---

[28]Doc. 46-15, Ex. 15-A.

[29]*Id.*

[30]Doc. 46-27, Ex. 27.

[31]*Id.* at 3.

inventory mistake.  In mid- to late-August 2013, Rusnack communicated to Bengsten his plan to restructure the Supply Chain department and eliminate Plaintiff's position.  Rusnack and Bengston completed a Separation/Severance Request on August 30, 2013.  The reason provided on this form is "position elimination."  The form further states: "Most job responsibilities moving to Michael Wilson (Financial Analyst Manager)."[32]  Attached to this form is a script for a September 9, 2013 severance conference meeting with Plaintiff.  It states: "Your employment with SBC is being terminated effective in two weeks (09/20/13) due to position elimination. . . . Due to this move, we are offering you a severance package provided you sign the separation document."[33]  Plaintiff was offered a total exit amount of $10,877, for three weeks of severance in addition to unused paid time off.

SBC's severance policy includes the following provision:

Eligible Employees whose employment has been involuntarily terminated by Company for reasons other than any of the following are eligible for Severance Pay:

(i) failure to comply with the reasonable requirements and/or duties of the Eligible Employee's position, including failure to comply with Company policies; or (ii) any other act or conduct which is determined by the Company, in its sole discretion, to be injurious to the Company, monetarily or otherwise.

Employees who are terminated for either of the reasons listed above shall not be entitled to any Severance Pay.[34]

On September 13, 2013, Rusnack announced the promotion of Wilson from Finance Manager to Director-Finance and Supply Chain, citing his three year successful history with SBC, building a "strong, efficient team driving business analysis and reporting structures critical

---

[32]Doc. 58-8, Ex. 7 at 1.

[33]*Id.* at 2.

[34]Doc. 58-17, Ex. 16 pt. V.

to the success of the company."[35]  Wilson absorbed Plaintiff's former job responsibilities,

delegating some to employees who reported to him.  SBC did not replace Plaintiff's Vice

President Supply Chain position.

Plaintiff was advised of her termination on September 9, 2013, and her employment with

SBC officially terminated on September 20, 2013.  Immediately after her September 9 meeting

with Rusnack, Plaintiff documented the conversation in handwritten notes, which Plaintiff

maintains are verbatim recollections of portions of their conversation.  According to Plaintiff's

notes, Rusnack told Plaintiff that the reason for her termination was to "cut costs," and when she

asked if it was because of her performance he said: "no.  You're doing a great job and have

worked really hard to get the new software up and running and it is."  Rusnack acknowledged

that the decision "doesn't make sense," and explained that the "owner believes in constructive

chaos where he wants short term chaos that will hopefully make the company better. . . . I don't

believe in it, but we have to cut costs."[36]

In its 2015 answers to interrogatories and in its 2014 EEOC position statement, SBC

explained its decision to terminate Plaintiff as follows:

> Rich Rusnack made the decision in late summer and early fall 2013 to restructure
> and consolidate the Supply Chain and Finance Departments at SBC.  As a result
> of this internal restructuring and consolidation, Plaintiff's position as Vice
> President of Supply Chain was eliminated.
>
> In June and July, 2013, Rusnack had learned that Plaintiff had not been
> effectively tracking the inventory that was ordered, such that SBC had ordered
> $2.4 million in excess inventory.  When confronted with her purchasing mistakes,
> Plaintiff took little responsibility for the issue and blamed the excess inventory on
> the Rockysoft software.  However, as Rusnack learned, she was not appropriately
> managing the Rockysoft software, which resulted in the purchase of the excess
> inventory.  These errors required SBC to increase its financing to cover the
> inventory and incur well over $50,000 in interest and loan fees.  Because of these

---

[35]Doc. 58-9, Ex. 8.

[36]Doc. 58-46, Ex. 45.

costly inventory purchasing errors, her failure to accept responsibility for these
errors, her failure to connect the Sales and Supply Chain Departments, and her
lack of an accounting background, Rusnack decided against considering Plaintiff
for a new position in the consolidated Finance and Supply Chain Department.[37]

Rusnack elaborated on Plaintiff's performance issues during his deposition.  He criticized
her ability to manage Ryan Monley, who was a manager in her department.  He also criticized
Plaintiff's transition to the RockySoft software, complaining that Plaintiff moved to the system
too quickly, and over-padded inventory in order to have enough safety stock to mitigate any risk
that the company might face during turnover.  Rusnack contended that Plaintiff was struggling to
build inventory that was based on the actual needs of the company, and that she was unable to
manage a poor cash flow forecasting model, leading to an extension of the company's credit line.
The extension of the company's credit line resulted in approximately $50,000 in additional
interest charged to SBC.

Both shortly before and immediately after Plaintiff's termination, SBC went out of stock
on core products such as Barton Vodka, Heineken, Corona, Bacardi, Crown Royal, and
Seagram's Seven as a result of incorrect forecasts developed during Plaintiff's employment as
Vice President-Supply Chain.  After Plaintiff's termination, Wilson began creating and running
several weekly reports to track safety stock, evaluate forecasting errors, determine days on hand,
calculate aged inventory, and project out-of-stock products in an effort to manage RockySoft
more proactively.  Wilson also changed RockySoft to evaluate sales patterns, rather than simply
looking at sales from the same month during the previous year.  Out-of-stock products decreased
and its fill rates increased in the year following Plaintiff's departure from SBC.

---

[37]Doc. 58-12, Pl. Ex. 11, No. 2 (Jan. 30, 2015); Doc. 58-42, Ex. 41 at 4 (Jan. 6, 2014).

### III.    Discussion

### A.    Title VII Claims

Defendant spends considerable time in its opening brief arguing that several of Plaintiff's Title VII claims are time barred. A plaintiff's allegation is timely if she files her EEOC charge within 300 days of the alleged unlawful employment practice.[38]  In this case, Plaintiff filed her charge of discrimination on October 28, 2013.  Defendant argues that any claims related to the cubicle, the company car, the CFO position, Plaintiff's bonus percentage, and her transfer from the Finance Department to the Supply Chain Department are time barred because they occurred more than 300 days before her charge was filed.  Although Defendant is correct that these employment actions may be time barred, Plaintiff makes clear in her response that her claims are not based on allegations that these are independent unlawful employment practices.  Instead, Plaintiff alleges that her termination was the unlawful employment practice at issue on her discrimination and retaliation claims.  As such, Defendant's motion for judgment on the basis of the statute of limitations is moot.

The parties agree that the disparate treatment and retaliation claims must be decided under the familiar *McDonnell Douglas v. Green*[39] burden-shifting framework because Plaintiff relies on circumstantial evidence.[40]  Under *McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie case of discrimination or retaliation.[41]  The burden of establishing the prima facie case is "not onerous."[42]  If plaintiff establishes a prima

---

[38]*Semsroth v. City of Wichita*, 304 F. App'x 707, 714 (10th Cir. 2008).

[39]411 U.S. 792, 802–05 (1973).

[40]*See, e.g.*, *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).

[41]*McDonnell Douglas*, 411 U.S. at 802.

[42]*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 238, 253 (1981).

facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[43]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[44]

### 1.    Discrimination

#### a.    Prima Facie Case

To establish a prima facie case of discriminatory termination under Title VII, Plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.[45]   In the context of a reduction in force ("RIF"), Plaintiff must show: (1) that she is within the protected gender group; (2) that she was doing satisfactory work; (3) that she was discharged despite the adequacy of her work; and (4) that there is some evidence that the employer intended to discriminate against her in reaching its RIF decision.[46]

Defendant argues that Plaintiff cannot satisfy a prima facie case in the context of a reduction in force because the evidence establishes that her performance was not satisfactory when her position was eliminated.  Plaintiff has offered sufficient evidence that her work was satisfactory under the minimal standard applicable at the prima facie stage.  She points to evidence that she was offered a severance package, which she contends she would not have been

---

[43]*Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[44]*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[45]*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context).  In the Tenth Circuit, the prima facie case no longer requires a "similarly-situated person" comparison.  *See Sorbo v. UPS*, 432 F.3d 1169, 1173 (10th Cir. 2005).  While the third element may be shown by evidence that the employer treated similarly-situated employees more favorably, "such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case." *Id.*

[46]*Beaird v. Seagate Tech. Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998).

eligible for if she was not performing her job satisfactorily.  Moreover, her notes about the

September 9, 2013 meeting with Rusnack reflect that Rusnack told her during that meeting that

she had been doing a "great job."  What is more, Rusnack told her that he understood that the

termination did not make sense, and suggested that he disagreed with the "short term chaos"

theory that resulted in the decision to eliminate her position.  The Court finds that Plaintiff has

satisfied her light burden of demonstrating a prima facie case of discriminatory termination.

### b.    Pretext

Defendant articulates a legitimate nondiscriminatory reason for Plaintiff's termination:

her position was eliminated as part of a departmental reorganization.  Defendant further asserts

that Plaintiff was not offered a different position in the newly consolidated Supply Chain and

Finance Department because of her poor performance during the summer of 2013 in her role as

Vice President of Supply Chain.  The burden therefore shifts back to Plaintiff to demonstrate a

genuine issue of material fact as to whether Defendant's job elimination explanation is a pretext

for unlawful discrimination.  Plaintiff can demonstrate pretext by showing "such weaknesses,

implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons."[47]  Mere

conjecture is not enough; a plaintiff must "cast doubt" on the employer's explanations by

specifically pointing out these "implausibilities, incoherencies, or contradictions."[48]

Typically, a plaintiff attempts to demonstrate pretext in one or more of three ways:

(1)With evidence that the defendant's stated reason for the adverse employment
action was false, (2) with evidence that the defendant acted contrary to a written
company policy prescribing the action to be taken by the defendant under the

---

[47]*Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997).

[48]*Id.* at 1323–25.

circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.[49]

Other evidence of pretext may include prior treatment of the plaintiff, and the use of subjective criteria.[50] Here, Plaintiff attempts to demonstrate pretext with evidence of shifting and false explanations for her termination, as well as prior discriminatory treatment.

Plaintiff primarily relies on shifting explanations for the termination decision. Although changing explanations for an adverse employment action may be evidence of pretext, "the mere fact that [an employer] has offered different explanations for its decision does not create a genuine question of pretext."[51] In considering whether shifting explanations are probative of pretext, the Court must consider (1) the timing of the change in explanation; and (2) the evidence supporting the newly-proffered explanation.[52]

According to Plaintiff's notes and testimony about the September 9, 2013 meeting, Rusnack told her that her job was being eliminated in order to cut costs and that ownership believed in creating "short term chaos." He acknowledged that the decision did not seem to make sense. Yet, Rusnack testified at length in his deposition that he had helped make the decision to restructure the department and terminate Plaintiff because of the many problems he had identified with Plaintiff's performance during the summer of 2013 with inventory levels and the RockySoft launch.

Defendant articulated its performance-based reasons for Plaintiff's termination for the first time in its EEOC position statement on January 6, 2014; this reasoning was repeated in

---

[49]*Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)) (quotations and citations omitted).

[50]*Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).

[51]*Smith v. Oklahoma ex rel. Tulsa Cnty. Dist. Atty.*, 245 F. App'x 807, 817 (10th Cir. 2007) (quoting *Jaramillo*, 427 F.3d at 1311).

[52]*Id.*

response to an interrogatory asking SBC to identify Rusnack's role in terminating Plaintiff's employment.  The timing of this change in explanation—after Plaintiff filed her EEOC complaint—could support an inference of pretext.[53]  Moreover, there is a genuine issue of fact as to the performance-based explanation for Plaintiff's termination.  Plaintiff only received one written evaluation during her tenure, in 2011.  It was a positive evaluation, with an overall rating of "exceeds expectations."  Although there is certainly documentation about the inventory problems and Rusnack's dissatisfaction with Plaintiff's performance in the summer of 2013, Plaintiff has offered contrary evidence in the form of her own declaration, blaming inventory and cash flow problems on Eric Williams' faulty cash flow forecasts and laying responsibility for the issue with Rusnack.  Though there are several emails evidencing Rusnack's dissatisfaction with Plaintiff's performance in the summer 2013, there is no evidence of verbal or written evaluations about these issues.  Plaintiff contends that these emails were an attempt by Rusnack to "paper her file" in order to blame the inventory problems on her.  Finally, Plaintiff points to the severance policy and argues that if she was being terminated for performance reasons, she should not have been eligible for a severance.  A reasonable jury could believe Plaintiff's testimony and, in conjunction with the timing of the explanation, infer pretext.

Defendant asserts that inconsistency evidence is only probative of discrimination if the "employer changed its explanation under circumstances that suggest dishonesty or bad faith."[54] But Rusnack's credibility is directly at issue in this case.  He testified at his deposition that he does not recall telling Plaintiff that her termination was unrelated to her performance.  He also denied telling her she had performed well on the RockySoft launch.  But this is directly contrary

---

[53]*See, e.g.*, *Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1381 (10th Cir.1994) (finding later explanation after EEOC complaint was filed probative of pretext).

[54]*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1002 (10th Cir. 2011).

to Plaintiff's recollection of that conversation, as documented by the notes she took immediately after that meeting.  This evidence goes beyond merely pointing to inconsistencies; a reasonable jury could believe Plaintiff's testimony and find that Rusnack's explanation at the time of her termination was made in bad faith.  A reasonable jury could believe, given the abundance of evidence documenting Rusnack's criticisms of Plaintiff's job performance, that he intentionally withheld that criticism from her when firing her and misrepresented that her termination was merely a cost cutting measure that he did not necessarily agree with.  On the other hand, a reasonable jury could believe Rusnack's testimony and find that Plaintiff either misremembered the conversation or did not accurately reflect in her notes Rusnack's comments about her job performance.  There is thus a genuine issue of material fact about whether Defendant's inconsistent and shifting explanations for Plaintiff's termination evidence pretext.

Finally, Plaintiff relies on her past treatment as evidence of pretext.  She points to evidence that she was denied an office for the first nine months of her tenure, she was denied a company vehicle, and that her bonus structure was not as favorable as other Vice Presidents. Specifically, Plaintiff has come forward with evidence that she was the only female Vice President at the company during this time and that she was treated differently with respect to these job perks as compared to her male peers.  With regard to the company vehicle program, Plaintiff offers evidence upon which a reasonable jury could infer discriminatory treatment because she was repeatedly told that she did not qualify for a company vehicle, despite contrary authority in the Handbook, and despite the fact that all other Vice Presidents who were male drove a company vehicle, regardless of whether their positions were in sales or required travel. Although Defendant is correct that these incidents are outside the statute of limitations, they are

admissible as evidence that Defendant's proffered explanation for the termination decision (which is timely) is a pretext for discrimination.

Defendant's motion for summary judgment on the discrimination claim is denied.

**2.      Retaliation**

The elements of a prima facie claim of retaliation under Title VII are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse employment action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[55]  Defendant argues that Plaintiff cannot show that she engaged in protected opposition to discrimination, or that this opposition caused her termination.

Defendant first argues that Plaintiff has failed to demonstrate that she engaged in protected opposition to discrimination.  "Protected opposition can range from filing formal charges to voicing informal complaints to superiors."[56]  Plaintiff claims that she engaged in the following protected opposition: (1) complaints to Alexander in March 2012 that she believed she was being unfairly treated in a manner that was discriminatory as the only female Vice President in comparison with the other male Vice Presidents; (2) complaints to Rosier and Alexander, and to HR manager Diez-Canseco between June 2011 and March 2012 about her lack of a company car; and (3) complaints to Alexander in mid-2012 and to Knight in August 2012, about the bonus increase for sales vice presidents only.  The Court assumes without deciding that these complaints constituted protected opposition to discrimination and proceeds to consider whether there is evidence of a causal connection between this activity and her termination.

---

[55]*McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[56]*Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

The Tenth Circuit has found a causal connection exists between the protected activity and the materially adverse action "where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive."[57]  Courts typically consider "protected conduct *closely followed by* adverse action" as sufficient evidence.[58]  However, when sufficient time has elapsed between the protected conduct and the adverse action, a court requires "additional evidence beyond temporal proximity to establish causation."[59]  When analyzing the additional evidence, the court can consider all the proffered evidence of retaliatory motive, which includes pretext evidence.[60]  "In order to make a prima facie case, one must only introduce evidence from which an inference can be drawn that an employer would not have taken the adverse action had the employee not filed prior discrimination charges."[61]  Ultimately, the burden of establishing a prima facie case is not onerous, but "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[62] The Supreme Court has recently clarified that a Title VII plaintiff asserting a claim of retaliation must show that his protected activity was the but-for cause of the alleged adverse employment action, and not merely a motivating factor.[63]

Plaintiff makes clear in her response that she alleges only one materially adverse employment employment action— her termination—and that she does not maintain separate

---

[57]*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[58]*Id.* (emphasis added).

[59]*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *see e.g., Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding one and one-half months establishes causation while three months is too long and does not).

[60]*Xia v. Salazar*, 503 F. App'x 577, 580 (10th Cir. 2012) (citing *Anderson*, 181 F.3d at 1179).

[61]*Tex. Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)

[62]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (affirming grant of summary judgment to employer because "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings.").

[63]*Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

claims with respect to the cubicle, company car, bonus changes, or being passed over for the CFO position. While she argues that these other actions establish a pattern of treatment that would allow a reasonable factfinder to infer a retaliatory motive, they are not alleged as materially adverse employment actions. Yet, as additional evidence of causation she relies upon temporal proximity between the alleged protected opposition and the untimely adverse employment actions. She argues: (1) almost immediately after she complained to Diez-Conseco about the company car policy in March 2012, the Handbook was amended to remove the policy and Alexander and Swank decided not to place Plaintiff in the "Lead Financial Person/CFO" position; and (2) two months after Plaintiff complained to Knight in August 2012 that she was being treated unfairly with respect to her bonus percentage eligibility, she was moved to the less desirable Vice President Supply Chain position in Lawrence.

It is undisputed that the complaints relied on by Plaintiff were made well over a year before she was terminated. And the Court agrees with Defendant that there is no evidence in the record that Plaintiff's 2012 complaints are connected to her 2013 termination. In fact, intervening events demonstrate that Plaintiff was rewarded. She was provided with a company vehicle that she drove for the remainder of her tenure, she was given bonuses in 2011 and 2012; she was given a 25.42% bonus on December 14, 2012 that was the third highest bonus paid to vice presidents at the company. Plaintiff was also given a 3% salary increase in October 2012, soon after transitioning to the Supply Chain department. In August 2011, she was given an overall positive written performance evaluation, despite having complained about the company car program. And although she was not selected as CFO in 2012, she was tasked with heading up the Supply Chain department because Alexander and Rusnack believed she had the skills to lead the department, and viewed this placement as an opportunity.

Plaintiff argues that evidence of "a pattern of antagonism and retaliation," salvages the lack of temporal proximity between her protected activity and her termination.  In *Marx v. Schnuck Markets, Inc.*, the Tenth Circuit considered a Fair Labor Standards Act ("FLSA") retaliation claim where the retaliation allegedly began with a write up after the plaintiff filed an FLSA claim, proceeded to a demotion, and then continued during the course of his FLSA suit and ended in his termination.[64]  The court denied summary judgment on the ground that Plaintiff could show a pattern of retaliatory conduct that culminated with his termination.[65]  The Tenth Circuit has cautioned "that the phrase 'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the filing of the FLSA complaint and only culminates later in actual discharge."[66]

Plaintiff's evidence in this case falls short of the causal connection presented by the plaintiff in *Schnuck*.  There is no evidence that a pattern of retaliatory conduct began shortly after her protected activity and continued through to her termination.  Despite her 2011 and 2012 complaints about the cubicle, vehicle, and bonus changes, Plaintiff was given a positive written job evaluation, salary increases, and high bonus awards as compared to her fellow Vice Presidents, and she was tasked with leading a new Supply Chain department after a 2012 restructuring.  If Defendant was simply waiting for an opportunity to terminate Plaintiff based on these complaints, it defies logic that it would reward Plaintiff in the interim.  Plaintiff's suggestion that Defendant was simply waiting for the right moment to "exact retribution" on

---

[64] 76 F.3d 324, 329 (10th Cir. 1996).

[65] *Id.*

[66] *Id.*

Plaintiff is too speculative to allow a reasonable jury to determine that there was an eighteen-month long pattern of retaliatory conduct that culminated in her termination.[67]

Finally, as Defendant points out, Plaintiff cannot demonstrate that the decisionmakers knew about her previous discrimination complaints.  The uncontroverted evidence establishes that Rusnack, with input from Swank, made the decision to terminate Plaintiff's employment.  But the complaints Plaintiff alleges she made about discrimination were made to others: Alexander, Rosier, Diez-Conseco, and Knight.  There is no evidence in the record that any of these individuals communicated her complaints to Rusnack or Swank.  Therefore, even if there was evidence in the record to support Plaintiff's retaliatory pattern of conduct theory of temporal proximity, it alone would be insufficient given the unrebutted evidence that Rusnack and Swank were unaware that Plaintiff had previously complained about discrimination.[68]

For all of these reasons, the Court cannot find sufficient evidence of a causal connection between Plaintiff's alleged protected activity and her termination that would support a reasonable inference of causation.  Thus, summary judgment is granted on Plaintiff's Title VII retaliation claim.

### B.    Public Policy Retaliation Under Kansas Law

Plaintiff's third cause of action alleges that she was terminated in retaliation for reporting liquor law violations to Alexander.  Kansas is an at-will employment jurisdiction, meaning that absent an express or implied contractual agreement, an employer is free to terminate employment

---

[67]*See Benton v. Adams Cnty. Bd. of Cnty. Commr's*, 303 F App'x 625, 630–31 (10th Cir. 2008) (distinguishing *Marx*); *Lebow v. Meredith Corp.*, 428 F. Supp. 2d 1202, 1221 (D. Kan. 2007) (finding progressive discipline intended to result in discharge that started soon after protected activity, constituted a pattern of retaliatory conduct).

[68]*See Villamar v. Lincare, Inc.*, 624 F. App'x 658, 662 (10th Cir. 2015) (citing *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).

at will.[69]  The Kansas Supreme Court, however, has recognized an exception to the at-will

employment doctrine for a common law tort of retaliatory discharge.[70]  The exception applies "to

protect a strongly held state public policy from being undermined."[71]  In *Palmer v. Brown*, the

Kansas Supreme Court held that "termination of an employee in retaliation for the good faith

reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an

employer to either company management or law enforcement officials (whistle-blowing) is an

actionable tort."[72]  The court enumerated the following requirements to maintain an action for

retaliatory discharge based on whistleblowing:

> To maintain such action, an employee has the burden of proving by clear and
> convincing evidence, under the facts of the case, a reasonably prudent person
> would have concluded the employee's co-worker or employer was engaged in
> activities in violation of rules, regulations, or the law pertaining to public health,
> safety, and the general welfare; the employer had knowledge of the employee's
> reporting of such violation prior to discharge of the employee; and the employee
> was discharged in retaliation for making the report. However, the whistle-blowing
> must have been done out of a good faith concern over the wrongful activity
> reported rather than from a corrupt motive such as malice, spite, jealousy or
> personal gain.[73]

A burden shifting analysis applies to these claims, so if the employee is able to make out a prima

facie case through clear and convincing evidence, the burden shifts back to the employer "to

present evidence that the employee was terminated for a legitimate reason, at which point the

burden shifts back to the employee to provide evidence that the reason given by the employer

was pretextual."[74]

---

[69]*Flenker v. Willamette Indus., Inc.*, 967 P.2d 295, 298 (Kan. 1998) (citing *Johnston v. Farmers Alliance Mutual Ins. Co.*, 545 P.2d 312 (Kan. 1976)).

[70]*Id.*

[71]*Campbell v. Husky Hogs, L.L.C.*, 255 P.3d 1, 4 (Kan. 2011).

[72]752 P.2d 685, 689–90  (Kan. 1988).

[73]*Id.*

[74]*Shaw v. S.W. Kan. Groundwater Mgmt. Dist. Three*, 219 P.3d 857, 862 (Kan. Ct. App. 2009).

1.      **Statute of Limitations**

Defendant first argues that some of Plaintiff's claims are barred by the two-year statute of limitations.[75]  Plaintiff responds first that Defendant waived this argument by not including it in the Pretrial Order.  The Pretrial Order "controls the course of the action unless the court modifies it."[76]  "As such, claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."[77]

Defendant raised its statute of limitations defense in the Pretrial Order in Part 4.b: "Defenses of Defendant."  That section is further divided by four subheadings: General Defenses, Defenses Applicable to Count I, Defenses Applicable to Counts III and IV, and Defenses Applicable to Plaintiff's Claims for Damages.[78]  Under the first subheading for "General Defenses," the Pretrial Order states:

> Plaintiff's claims that are based on alleged actions by SBC that occurred prior to January 1, 2013 (300 days before Plaintiff filed her KHRC Charge of Discrimination on October 28, 2013) are barred by the applicable statutes of limitation. 42 U.S.C. § 2000e-5(e); 29 U.S.C. 626(d)(1). The continuing violation doctrine does not apply in this case. Specifically, the claims related to: (i) the cubicle, (ii) the CFO position, (iii) her transfer to Vice President of Supply Chain, (iv) her bonus and bonus structure, (v) the company car, and (vi) retaliation based on any complaints of discrimination or reporting to SBC of any alleged violations of liquor control laws, are all discrete acts that are time-barred.[79]

---

[75]K.S.A. § 60-513(a)(4); *see Pfeifer v. Fed. Exp. Corp.*, 304 P.3d 1226, 1228 (Kan. 2013).

[76]Fed. R. Civ. P. 16(d); *see Lohmann & Rauscher, Inc. v. YKK (U.S.A.) Inc.*, 477 F. Supp. 2d 1147, 1152 (D. Kan. 2007).

[77]*Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).

[78]Doc. 43 at 15–17.

[79]*Id.* at 15.

The Court finds that this section of the Pretrial Order included Defendant's statute of limitations defense as to all claims, including the whistleblower retaliation claim.  It was included in an umbrella section of defenses that appears before the defenses specific to each claim.  Defendant did not include a statute of limitations defense under any of the other headings that applied to specific claims.  Defendant included in its list of claims that are time-barred "retaliation based on any complaints of discrimination or reporting to SBC of any alleged violations of liquor control laws."  This language should have placed Plaintiff on notice that Defendant asserted a statute of limitations defense as to all claims.

Under K.S.A. § 60-513(a)(4), any actions that accrued two years before the Complaint in this case was filed on July 22, 2014, are barred by the statute of limitations.  Therefore, Plaintiff's claim that she was passed over for the CFO promotion in May 2012 is time-barred.  As acknowledged by Defendant however, Plaintiff's claims associated with the failure to promote her to CFO  in 2013, and with her termination, are timely.

### 2.      Job Requirement

Defendant next argues that Plaintiff cannot maintain a claim of whistleblower retaliation under the circumstances of this case because reporting liquor control law violations was part of her job description, and thus could not be "whistleblowing."  Defendant relies on *Adler v. Continental Ins. Co.*,[80] a 1996 unpublished decision from this district construing a retaliatory discharge claim under the False Claims Act ("FCA").  Under the FCA whistleblower provision, "[a]n employee may file a private action on behalf of the government against her employer . . . or the government may file its own action . . . to recover damages resulting from the false claims

---

[80]No. 95-2282-EEO, 1996 WL 677085 (D. Kan. Nov. 1, 1996).

submitted to the government."[81]   The court explained in *Adler* that "the FCA generally does not

protect activities that are within the scope of an employee's job responsibilities."[82]   All of the

cases cited by the *Adler* court in support of this proposition pertain to the FCA.[83]   And Defendant

has pointed the Court to no bright line corollary rule announced by the Kansas courts that applies

to whistleblower retaliation claims under Kansas law.[84]   Without more, the Court declines to

import this rule from the FCA context and apply it to this public policy retaliation claim under

Kansas law.  Moreover, even if this rule applied in Kansas, the Court finds there is a genuine

issue of material fact about whether the reports at issue were part of Plaintiff's normal job

responsibilities.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury

could conclude that the three violations she reported were not part of her normal responsibilities,

but instead were deviations she discovered through reports or other documents she maintained

for other reasons.

### 3.    Causation

Finally, Defendant urges that there is no evidence of a causal link between Plaintiff's

reporting of liquor law violations between December 2011 and June 2012, and the failure to

promote her and terminate her in 2013.  The Court agrees.  Plaintiff 's protected activity occurred

---

[81]*Id.* at *4.

[82]*Id.*

[83]*Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir. 1994); *X Corp. v. Doe*, 816 F. Supp. 1086, 1095 (E.D. Va. 1993) ; *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996).

[84]Defendant points the Court to the First Circuit's decision in *Winslow v. Aroostook County*, which applied this rule to a claim of statutory whistleblower retaliation under Maine law.  736 F.3d 23, 32 (1st Cir. 2013).  There, the court stated that "the *usual* rule in Maine is that a plaintiff's reports are not whistleblowing if it is part of his or her job responsibilities to make such reports, particularly when instructed to do so by a superior."  *Id.* (emphasis added).  But a more recent First Circuit decision disavows this language as creating a blanket exception to employer liability under the Maine act.  *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36 (1st Cir. 2016).  Instead, the court held that the proper inquiry is the employee's motivation in reporting—whether the person "'acting in good faith' reports 'what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of any other individual.'"  *Id.* at 51 (quoting *Cormier v. Genesis Healthcare LLC*, 129 A.3d 944, 949 (Me. 2015)) (footnote omitted).

in late 2011, May 2012, and early summer 2012.  Viewed in the light most favorable to Plaintiff, Swank spoke to her about a "CFO-type" position in December 2011, the same month when she discovered the expense reports.  Plaintiff characterizes the first CFO promotion decision as being made in May 2012, but it is uncontroverted that in April 2012, Rusnack and Swank exchanged an email about the Finance Department's reorganization, in which they agreed that Plaintiff would not be made CFO.  This decision was made before Plaintiff reported further liquor control law violations.  Moreover, it is uncontroverted that Plaintiff reported the liquor control law violations to Alexander, and worked primarily with him to investigate the violations.  While there is evidence that owner Leslie Rudd was made aware of her reports, there is no indication that Rudd and Alexander participated in the termination decision.

And similar to her Title VII retaliation claim, intervening conduct between Plaintiff's reports and the adverse employment actions belie an inference that Plaintiff was retaliated against for bringing these liquor control law violations to the attention of her superiors.  Months after these reports, Plaintiff was given a significant bonus and a salary increase.  She was also tasked with heading up the Supply Chain department.  Plaintiff cannot point the Court to clear and convincing evidence that these reports caused her to be passed over for the CFO position in May 2013, or that these reports contributed toward the decision to terminate her in September and October 2013, more than one year after these reports.  Therefore, summary judgment is granted as to the whistleblower protection claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 44) is **granted in part and denied in part**.  Summary judgment is granted on Plaintiff's retaliation claims.  Summary judgment is denied as to Plaintiff's Title VII discrimination claim.

**IT IS SO ORDERED.**

Dated: <u>March 18, 2016</u>

<u>  S/ Julie A. Robinson</u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE